597 A.2d 1049

**REISTERSTOWN PLAZA ASSOCIATES**

v.

**GENERAL NUTRITION CENTER, INC.**

**No. 43 Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Nov. 5, 1991.

Lawrence S. Greenwald (Robert E. Sharkey and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, on the brief), Baltimore, for appellant.

Peter J. McNamara (Jervis S. Finney, Charles T. Smith, II and Ober, Kaler, Grimes & Shriver, on the brief), Baltimore, for appellee.

Argued before ROSALYN B. BELL, FISCHER and HARRELL, JJ.

ROSALYN B. BELL, Judge.

In February, 1987, appellant, Reisterstown Plaza Associates (RPA), filed a complaint against the appellee, General Nutrition Center, Inc. (GNC), for unpaid rent and other charges, plus attorneys' fees. RPA alleged that GNC owed it money under a lease agreement for a store located in the Reisterstown Plaza Shopping Center. GNC counterclaimed asserting six counts, including claims based on contractual, common law and tort theories. GNC also asked for attorneys' fees. The jury returned a general verdict in favor of GNC and the trial court awarded damages and attorneys' fees.

On appeal, RPA contends that the trial judge erred in:

— awarding GNC damages for the loss of the value of its fixtures and leasehold improvements which were not owned or were abandoned by GNC;

— awarding attorneys' fees and expenses incurred in a case brought for purposes other than enforcement of GNC's lease, where the jury returned a general verdict without specifying the ground for finding in favor of GNC and where under any circumstances the award for attorneys' fees is grossly disproportionate to the amount recovered;

— awarding prejudgment interest on damages for loss of use of fixtures and equipment, where those items were useable only in a business operating at a loss; and

— calculating the prejudgment interest rate at 10% per annum when the Maryland Court of Appeals has recently ruled that the proper rate for prejudgment interest is six percent.

While we agree that GNC is entitled to damages for what amounted to a constructive eviction, we remand the case for a recalculation of the prejudgment interest and for the trial judge to determine if GNC is entitled to recover attorneys' fees incurred in defending this appeal.

RPA owns the Reisterstown Plaza and is the landlord in this dispute. GNC, the tenant, is a national retail chain whose stores sell natural foods and health products to the public. RPA leased the Reisterstown store to GNC under an agreement dated November 29, 1982. The lease was a standard commercial lease and was to run for a term of 10 years. Reisterstown Plaza is a one-level mall. GNC faced on the interior of the mall and was surrounded by a common area for which the landlord, RPA, was responsible under the terms of the lease. At the rear of GNC was an exterior door that opened up into the back of the mall. The trash dumpster, which serviced the entire mall, was located immediately behind GNC.

In February or March of 1986, a rodent problem arose at the store, and it worsened despite persistent actions taken by GNC personnel and its exterminators. GNC, its regional managers, and even its national representatives, pressed the mall's management over an extended period of time to control and stop the source of the rodent infestation. Testimony and documents demonstrated that the primary source of the infestation was the common areas of the mall at the front of GNC. GNC, because of its stock of foodstuffs, was particularly susceptible to the rodent problem. RPA was unsuccessful in its attempts to correct the situation, and on September 27, 1986, after the infestation problem at GNC continued to worsen, Alvin Greenberg, Vice President of Real Estate and Construction for GNC, ordered the store to be vacated. Greenberg testified that he "ordered the premises to be vacated because the infestation problem was intolerable and threatened the health and safety of GNC's customers and employees."

GNC made no further payment to RPA under the lease, and RPA brought suit, in the Circuit Court for Baltimore City, for breach of the lease and damages. Based on an agreement between the parties a bifurcated trial was held. The jury returned a general verdict in favor of GNC. In the second half of the proceedings, the trial court returned a damage award in favor of GNC. The Court awarded

$2,948.35 for products in inventory lost due to infestation while GNC was operating. This award is not challenged by RPA. The Court also awarded GNC $76,389.56 for the loss of fixtures and loss of leasehold improvements in the store; $141,784.42 for attorneys' fees and expenses; and prejudgment interest on the damages awarded at the rate of 10 percent per annum.

## LOSS OF FIXTURES AND LEASEHOLD IMPROVEMENTS

RPA contends that GNC is not entitled to the $76,389.56 in damages for the loss of fixtures and leasehold improvements made to the store since the items were not owned or were abandoned by GNC. RPA claims this is especially true in light of the fact that the GNC store was not profitable and, therefore, GNC actually derived a benefit from its early closing. We find no merit in either argument.

Paragraph 14.04 of the lease agreement between the parties provides:

"... All installations, alterations, additions, betterments and improvements upon the Demised Premises made by any party, including without limitation, all pipes, ducts, conduits, wiring, panelling, partitions, railings, mezzanine floors, galleries and the like shall become the property of Landlord when installed and shall remain upon and be surrendered with the Demised Premises as part thereof at the expiration or sooner termination of the Term. Movable trade fixtures and other personal property which Tenant installs at its own expense shall remain Tenant's property and may be removed at any time provided Tenant promptly repairs any damage caused by such removal."

RPA argues that under this agreement all improvements became the property of RPA "when installed" and were to be "surrendered with the Demised Premises" at the end of the lease term. While the terms of the lease

contract between the parties are clear, RPA breached the agreement. GNC is, therefore, entitled to recover the benefit it would have received had the lease run its full term.

In *National Micrographic Systems, Inc. v. OCE–Industries, Inc.*, 55 Md.App. 526, 538, 465 A.2d 862, *cert. denied*, 298 Md. 395, 470 A.2d 353 (1984), this Court stated:

"The law seeks to encourage reliable contracting by giving the non-breaching party the benefit of the bargain—placing it in the position it would have occupied had no breach occurred. The law also seeks to discourage breach of contract by seeing to it that a party does not benefit from its breach."

In *Stevan v. Brown*, 54 Md.App. 235, 242–43, 458 A.2d 466, *cert. denied, Tower Building Corp. v. Stevan*, 297 Md. 111 (1983), this Court cited with approval *Weighley v. Muller*, 51 Pa.Super.Ct. 125, 132 (1912), which held:

"If the tenant was evicted by the landlord or by acts equivalent to an eviction was deprived of his pecuniary interest under the lease, he was entitled to recover as damages the loss suffered by him—to be put in the same position pecuniarily as he would have been if the contract had been kept—when the damages are the natural result of such breach of contract and can be ascertained with reasonable certainty."

 Greenberg testified at trial that, except for small appliances, such as the cash register and peanut butter machine, all of the furniture and fixtures were, in fact, abandoned when the store was closed. According to Greenberg, this is routinely done whenever GNC closes a store, since such items cannot be used in another GNC store. The items cannot be reused because each store has its own unique dimensions and specifications. He testified that the salvage value for the small items is minimal, maybe "a couple thousand dollars." Greenberg based his testimony on experience and the history of the closings of GNC stores. His testimony was supported by Edward Kozlowski, the Vice–President and Chief Financial Officer of GNC, who

stated that the furniture and fixtures in the store have no fair market value when removed from the GNC store.

In calculating the $76,389.56 figure for the loss of fixtures and loss of leasehold improvements in the store, the trial judge excluded the value of the cash register and peanut butter machine which GNC officials had removed when they closed the store.[1] Then he subtracted straight-line depreciation from the original cost of the remaining items. In explaining how he arrived at the damage figure, the judge said:

"When it came to consideration of the claim by GNC for the value of loss—for the loss rather, of fixtures and leasehold improvements, the Court did have a method of determination and did have a reasonable way of arriving at what that loss could be. Obviously and clearly it was not the best method. We had no way of determining a market value since this, these fixtures and leasehold improvements were in fact as the testimony showed, custom built specifically to be used in one location and obviously could not be used anywhere else so that upon the expiration of that use they would have at best scrap value aside from the registers as we all noted. That is not to say however, that there was [no] value to these fixtures and to those leasehold improvements. That is not to say that the defendant did not lose considerable money because it was proven to the satisfaction of the Court that there was a substantial life remaining in these fixtures and improvements that had they been permitted to serve the remainder of their lease and any possible renewal of that lease, they would have been of tremendous value to the operator.

"As I have indicated, if the Court had allowed loss of profits it would not have allowed loss of fixtures as a

---

1. Although under the prevailing case law GNC would have been entitled, in the alternative, to recover lost profits, the judge held that the future profitability of the GNC store was not proven with reasonable certainty. Neither party objects to this ruling.

duplication which I have considered it would have been and so stated. But certainly the Court could and did make a determination that it would as reasonably as it could, as fairly as I could, put a value on the fixtures and the best way to do it was original cost less depreciation.

"This is an accepted method of appraisal and the Court had no difficulty in concluding that this was the fairest method to do so in this case."

We concur with the trial judge's method of placing a dollar value on the loss suffered by GNC.

■ Rule 8–131(c) provides that in a nonjury trial an appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." The trial court's fact finding will be affirmed on appeal unless clearly erroneous. *Gosman v. Gosman*, 19 Md.App. 66, 78, 309 A.2d 34 (1973), *modified*, 271 Md. 514, 318 A.2d 821 (1974). Even though this was a jury trial the jury was only utilized to reach a general verdict and it was up to the trial judge to make the damage award.

The commentary that accompanies the Restatement (Second) of Property § 10.2 (1977) states:

"The tenant may have made expenditures in advance of the landlord's default to enable him to have the enjoyment of the leased premises contemplated by the parties. These expenditures may relate to the costs of moving to the leased premises, the cost of acquiring trade fixtures for use on the leased premises, or the cost of placing improvements on the leased premises. To the extent that the tenant sustains a loss in regard to these pre-default expenditures by virtue of the landlord's default, the tenant is entitled to include that loss in his damages. These pre-default expenditures of the tenant must be reasonable in amount and such that the landlord should reasonably have foreseen that they would be made by the tenant in order for them to be considered in determining the damage sustained by the tenant."

We hold that the trial judge did not err in awarding the $76,389.56 figure.

■ RPA claims that any award to GNC will be a windfall, because the store had not shown any profit and had suffered losses of between $42,000–$82,000 in each of the three years it had remained open. This argument is flawed for at least two reasons.

First, RPA has failed to account for the negative impact that its own actions had on GNC's profitability. Various witnesses testified that due to the rodent infestation GNC could not maintain an inventory of many of its best selling food items, could not keep any of its products on the lower shelves in the store—even while the store was open—and had customers see mice and the evidence of mice while they were shopping. Second, RPA's in-house counsel testified that RPA had problems keeping "anchor tenants" [2] in the mall in 1985 and 1986 and this contributed to the decline in sales for all of the rest of the tenants in the mall. In addition, Greenberg denied at trial that the store had been closed for financial reasons. The trial court also recognized that "it would take three (3) years for a new store to begin to show a profit." Thus GNC did not, as RPA contends, obtain any benefit from the early closing of the store.

## ATTORNEYS' FEES AND EXPENSES

RPA next contends that GNC is not entitled under the terms of the lease agreement to any of its attorneys' fees or expenses. RPA argues that the jury's verdict was a general one and thus it is impossible to determine whether the verdict was based on GNC's defense to RPA's suit or the counterclaims it raised.

■ As a general rule, other than the usual and ordinary court costs, the expenses of litigation, including legal fees incurred by the successful party, are generally not

---

**2.** Anchor tenants are the larger stores which tend to draw more shoppers to a mall.

recoverable in an action for damages. *Dixon v. Process Corp.*, 46 Md.App. 198, 210, 416 A.2d 1295 (1980), quoting *Empire Realty Co. v. Fleisher*, 269 Md. 278, 285, 305 A.2d 144 (1974). Attorneys' fees and other litigation costs, may, however, be awarded based upon a contract between the parties. *Maxima Corp. v. Cystic Fibrosis Foundation*, 81 Md.App. 602, 622, 568 A.2d 1170, *cert. denied, 6933 Arlington Development v. Maxima Corp.*, 319 Md. 582, 573 A.2d 1337 (1990).

■ Paragraph 13.02 of the lease agreement between RPA and GNC provides in pertinent part:

"Landlord and Tenant shall pay to the prevailing party on demand, such expenses as Landlord or Tenant may incur, including, without limitation, court costs and attorneys' fees and disbursements, in enforcing the performance of any obligation of the other under this Lease."

RPA contends that GNC is not entitled to an award of attorneys' fees because the language of the clause limits the parties to collecting counsel fees only when an action was brought to enforce the *"performance of any obligation of the other under this Lease."* (Emphasis added) This clause, RPA argues, limits GNC to reimbursement for attorneys' fees and expenses incurred in connection with specific claims brought to "enforce" RPA's obligations as a landlord. RPA argues that under the plain meaning of the clause, GNC's defense and counterclaims were not brought to enforce any of RPA's obligations under the lease and, as such, GNC is not entitled to recover attorneys' fees or costs. We disagree.

RPA cites *Washington v. Metropolitan Life Insurance Co.*, 330 A.2d 525, (D.C.App.1974), *Relational Systems International v. Cable*, 85 Or.App. 541, 737 P.2d 645 (1987), and *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324 (10th Cir.1984), to bolster its position that the courts must construe clauses awarding attorneys' fees narrowly.

In *Washington v. Metropolitan Life Insurance Co.*, the District of Columbia Court of Appeals held that Metropoli-

tan, the holder of a note secured by a deed of trust on real property of Washington, was not entitled to its attorneys' fees incurred in defending against an attempt by the government to enforce a tax lien on the property in question. Under the terms of the note, Washington had agreed to pay all costs of collection or enforcement of the note, or any part thereof. The court held that the course pursued by Metropolitan was, at best, a defense of the priority of its lien, not an enforcement of the lien itself, and thus Metropolitan was not entitled to recover any of its attorneys' fees. *Washington*, 330 A.2d at 528.

In *Relational Systems*, a tenant brought an action for fire-related property damages caused by the landlord's negligent design and construction of the building which the landlord owned. After mounting a successful defense, the landlord sought to recover his attorneys' fees under the provisions of the lease agreement. The lease agreement provided:

"In case suit or action is instituted to enforce compliance with any of the terms ... of this lease ... the losing party agrees to pay such sum as the trial court may adjudge reasonable as attorney's fees to be allowed the prevailing party in such suit or action."

The Court of Appeals of Oregon, in rejecting the landlord's claim stated that the tenant sought neither enforcement of the contract nor damages for its breach, but based his action on a pure negligence theory. *Relational Systems*, 737 P.2d at 646.

Finally, in *Fortier*, a shopping center buyer brought suit against the developers/sellers for negligence, breach of contract and fraud in connection with certain deficiencies in the shopping center's parking lot. According to the contract of sale between the parties, the winning party was entitled to reasonable attorneys' fees incurred in "enforcing" the agreement. The United States Court of Appeals for the Tenth Circuit held that the developer/seller was responsible for attorneys' fees only in connection with the contract claims in the case. The Court stated that with

respect to the non-contract claims each party was responsible for its own attorneys' fees and expenses. *Fortier,* 747 F.2d at 1338.

RPA argues that, under the general jury verdict rendered in the case now before us, it cannot be determined on which claims or defenses the verdict was based. RPA cites to *Larche v. Car Wholesalers, Inc.,* 80 Md.App. 322, 562 A.2d 1305 (1989), to support this contention. We find, however, RPA's reliance on *Larche* and the other previously cited cases to be misplaced.

In *Larche,* appellant purchased an automobile from a licensed used car dealer. The car, which had been represented as a "demonstrator," turned out, in fact, to be a used car. Appellant asserted causes of action for fraud, breach of warranty, breach of contract, unfair and deceptive trade practice, negligent misrepresentation, civil conspiracy and violation of the Magnuson–Moss Warranty Federal Trade Commission Improvement Act, 15 U.S.C. § 2310(d) and (e) (1975). Attorneys' fees were available only under the Magnuson–Moss claim, but the jury returned a general verdict. This court remanded the case for a retrial of the Magnuson–Moss claim.

*Larche* and the other cases cited by appellant differ from the case now before us. In the cases cited by RPA, recovery of attorneys' fees was disallowed because the actions were not brought under the terms of the contracts between the parties. In the instant case, however, all of the expenses incurred by GNC were a result of the enforcement of the lease agreement. GNC incurred expense in defending against RPA's initial lawsuit, which was brought to enforce GNC's obligations under the lease. In addition, all of GNC's counterclaims, even those claiming nuisance and negligence, were grounded in breaches by RPA of its duties and obligations as a landlord.

The trial judge in allowing attorneys' fees and expenses stated:

"[T]he initial cause of action brought by RPA was to enforce the performance of GNC's obligations under the lease. A large part of GNC's fees and expenses incurred was to defend against this suit. The alternative theories on which the counterclaims were brought by GNC against RPA were based on the failure of the landlord, RPA, to perform its obligation under the lease.

"Thus, GNC, both as Defendant and as Counter–Plaintiff, is entitled to recover its attorneys' fees, expenses and costs incurred in this case. Paragraph 13.02 makes mandatory the payment of such expense to the prevailing party upon demand."

We find no reason to set the judge's ruling aside.

■ RPA also ignores the line of cases from two other jurisdictions which hold that "[a] party may recover attorney fees rendered in connection with all claims if they arise out of the same transaction and are 'so interrelated that their prosecution or defense entails proof or denial of essentially the same facts.'" [3] *Coleman v. Rotana, Inc.*, 778 S.W.2d 867, 874 (Tex.Ct.App.1989); *see Grebb v. Murray*, 102 Or.App. 573, 795 P.2d 1087, 1088 (1990); *Gill Savings Ass'n v. Chair King, Inc.*, 783 S.W.2d 674, 680 (Tex.Ct.App. 1989), *aff'd in part and modified in part*, 797 S.W.2d 31 (Tex.1990).

---

**3.** The two Texas cases are based on a Texas statute, Tex.Civ.Prac. & Rem.Code Ann. § 38.001 (Vernon 1989), Recovery of Attorney's Fees. To the extent it deals with contracts, it is in keeping with Maryland common law and states:
"A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:
(1) rendered services;
(2) performed labor;
(3) furnished material;
(4) freight or express overcharges;
(5) lost or damaged freight or express;
(6) killed or injured stock;
(7) a sworn account; or
(8) an oral or written contract."

In *Coleman,* the landlord brought suit against the tenants for rent and the tenants counterclaimed for constructive eviction and breach of implied warranty of suitability. The Court of Appeals of Texas found that the landlord's claim for rent and the tenant's counterclaims arose out of the same transaction. Because the landlord had to defeat the counterclaims in order to prevail, the rental claim and the counterclaims were so interrelated that they involved proof or denial of the same facts. Segregation of fees became impossible as well; thus, the Court held that such segregation was not required.

RPA asserts that GNC's counterclaim involves matters which do not pertain to enforcing obligations under the lease and, therefore, GNC is not entitled to its fees unless they can be segregated. Again, we disagree.

GNC's counterclaims were for a breach of contractual duties to maintain common areas; breach of the contractual covenant of Quiet Enjoyment; constructive eviction; nuisance caused by the acts, omissions and breach of RPA; and negligence in failing to act as a reasonable and prudent landlord. All of these counterclaims relate to RPA's obligations as a landlord under the terms of the lease. Thus, GNC's defenses to RPA's charge of breaching the lease agreement and its counterclaims arose out of the same transaction and required proof or denial of essentially the same facts.

In the alternative, RPA argues that, even if GNC were entitled to an award of attorneys' fees and expenses, the $141,784.42 award made by the trial judge was "so grossly disproportionate to the monetary recovery that it is, as a matter of law, unreasonable and arbitrary." We disagree.

RPA challenges the award of $141,784.42 for attorneys' fees and expenses as being "grossly disproportionate." This is not, however, the correct legal standard.

Rule 1.5(a) of the Rules of Professional Conduct states: "A lawyer's fee shall be reasonable." The factors to be

considered in determining the reasonableness of a fee include the following:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

"(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

"(3) the fee customarily charged in the locality for similar legal services;

"(4) the amount involved and the results obtained;

"(5) the time limitations imposed by the client or by the circumstances;

"(6) the nature and length of the professional relationship with the client;

"(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

"(8) whether the fee is fixed or contingent."

The Court of Appeals used the same factors in *Attorney Grievance Commission v. Korotki*, 318 Md. 646, 664–65, 569 A.2d 1224 (1990). Korotki received an 18–month suspension for charging his clients what amounted to a 75 percent contingency fee. The Court of Appeals held that such a fee was "clearly excessive" under Disciplinary Rule 2–106, now Rule 1.5. *See Head v. Head*, 66 Md.App. 655, 670–71, 505 A.2d 868 (1986).

RPA also cites to a line of cases from other jurisdictions which hold that the award of attorneys' fees will be overturned if they do not bear a reasonable relationship to the results obtained. For example, in *Lumberman's Mutual Casualty Co. v. Quintana*, 366 So.2d 529, 530 (Fla.App. 1979), the Florida Court reversed a $20,000 award of attorneys' fees in a case where there was only a $15,000 liability.

In *Armstrong Forest Product v. Redempco, Inc.*, 818 S.W.2d 446 (Tex.App.1991), the Texas appellate court, reduced an award of attorneys' fees from $23,000 to $7,500,

stating "the trial court, as well as the appellate court, has the duty to reduce the fee pled for if it is excessive."

In the case now before us, we cannot say that as a matter of law the fees awarded were unreasonable. While the actual damage award was only $79,337.91, GNC had to defend against a suit that had they lost would have forced them to pay six-and-one-half years of rent to RPA, exposed them to adverse publicity and possible claims by clients and employees. RPA in its initial complaint asked for a judgment of $27,859.59, plus court costs and attorneys' fees. In its second amended complaint, the figure was raised to $225,000 to cover all rent, late charges, fees, interest, attorneys' fees, and all other damages accruing up to the date of trial.[4] Given these factors, the award of $141,784.42 bears a reasonable relationship to the liability involved and is therefore affirmed.

Moreover, we note that as a general rule the question of attorneys' fees is a factual matter which lies within the "sound discretion of the trial judge and will not be overturned unless clearly erroneous." *Dent v. Simmons*, 61 Md.App. 122, 127, 485 A.2d 270 (1985), quoting *Foster v. Foster*, 33 Md.App. 73, 81, 364 A.2d 65, *cert. denied*, 278 Md. 722 (1976). In this particular case, however, we have not been provided with any of the relevant testimony.[5] Thus, the factual findings of the trial judge cannot be reviewed.

## PREJUDGMENT INTEREST

RPA argues that the trial court also erred in awarding prejudgment interest on damages for loss of use of fixtures and equipment, where those items were useable

---

4. At oral argument, GNC asserted that it estimated that its potential liability in relation to this suit could have reached $600,000.

5. The hearing on attorneys' fees was held on August 1, 1990. A letter from the Chief Court Reporter of the Circuit Court for Baltimore City states that the entire videotape for August 1, 1990 was blank, indicating that the video equipment was not activated.

only in a business operating at a loss. RPA contends that GNC has not lost anything attributable to the fixtures or leasehold improvements and again claims that, through the avoidance of yearly losses, GNC has actually derived a benefit from the constructive eviction. Since GNC is entitled to damages for the loss of fixtures and leasehold improvements, it is entitled to prejudgment interest on the damage award as well.

RPA correctly cites to *Mullan Contracting Co. v. International Business Machines Corp.*, 220 Md. 248, 151 A.2d 906 (1958), which holds that: "[t]he allowance of interest is a matter which rests in the discretion of the trier of the fact." *Mullan*, 220 Md. at 261, 151 A.2d 906. In the case now before us, the trial judge found it appropriate to award interest on the damage award and attorneys' fees from September 27, 1986. We find no reason to overturn his decision.

—Prejudgment Interest Rate—

■ The total award figure, however, will have to be recalculated on remand. In awarding prejudgment interest, the trial judge used a 10 percent interest rate. The Court of Appeals in *First Virginia Bank v. Settles*, 322 Md. 555, 566, 588 A.2d 803 (1991), and in *Maryland National Bank v. Cummins*, 322 Md. 570, 600, 588 A.2d 1205 (1991), held that the only allowable rate for prejudgment interest is six percent per annum, in accordance with Art. III, § 57 of the Constitution of Maryland. GNC agrees that six percent is the correct rate of interest and that the judgment needs to be revised to reflect the appropriate rate.

In summation, we hold that the award of damages for the loss of leasehold improvements and fixtures was appropriate but the total calculation was made at an incorrect rate of interest. We are remanding this matter for a revision of the prejudgment interest charged. We also find that the award of attorneys' fees and expenses was appropriate. We decline, however, to rule on GNC's claim for attorneys

fees and expenses incurred in bringing this appeal and leave that to the discretion of the court on remand.

JUDGMENTS AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ¾ BY APPELLANT AND ¼ BY APPELLEE.